**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **AMANDA COSTELLO and LONIECE REED,** individually and on behalf of all other persons similarly situated, | **Case No. 13 Civ. 1359 (GHW)** |
| **Plaintiff,** | |
| **-against-** | |
| **KOHL'S ILLINOIS INC., KOHL'S CORPORATION and KOHL'S DEPARTMENT STORES, INC.,** | **DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION** |
| **Defendants.** | |

OF COUNSEL:

Lisa Ann Schreter, admitted *pro hac vice*
Littler Mendelson, P.C.
3348 Peachtree Road, N.E., Suite 1100
Atlanta, GA 30326-1008
(404) 233-0330
Fax: (404) 233-2361
Email: lschreter@littler.com

Jaime L. Novikoff
Richard W. Black, admitted *pro hac vice*
Littler Mendelson, P.C.
1150 17th St., N.W., Suite 900
Washington, DC 20036
(202) 842-3400
Email:  jnovikoff@littler.com
          rblack@littler.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

    A.    Kohl's Structure, Business Operations and Retail Store Hierarchy ..................... 2

    B.    Plaintiffs' Employment With Kohl's .................................................................... 4

    C.    Evidence of Material Differences In The Performance of The ASM Position ........................................................................................................... 5

        1.    The ASM Job Description, Management Training, and Kohl's Corporate Policies Make Clear ASMs are Managers. .............................. 5

            a.    The ASM Job Description .......................................................... 5

            b.    Kohl's Comprehensive and Flexible ASM Training .................... 7

            c.    Kohl's guideposts further define ASMs' management role ......... 9

        2.    Costello's and Reed's View: Contradictory Plaintiffs' Testimony and The Failure to Perform According to Kohl's Expectations ............. 10

        3.    Plaintiffs' Peers: Corroborating ASMs' Primary Duty of Management ........................................................................................ 12

LEGAL ARGUMENT ............................................................................................ 14

    A.    Authorization Of Notice Under The FLSA Is Discretionary And Should Only Be Granted In "Appropriate" Cases ............................................ 14

    B.    The Legal Context Within Which Plaintiffs' Claim Must Be Adjudicated ........ 16

    C.    Recent Retail ASM Cases Squarely Reject Plaintiffs' Argument They Are Similarly Situated Based On Lawful Common Policies and Job Descriptions ..................................................................................................... 18

    D.    Costello's and Reed's claim is too individualized for representative proof ....... 24

CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

PAGE

CASES

*Ahmed v. T.J. Maxx Corp.,*
    10-cv-3609, 2013 U.S. Dist. LEXIS 81942 . (E.D.N.Y. June 8, 2013) ............................16, 21, 23

*Ali v. New York City Health and Hosp. Corp.,*
    No. 11 Civ 6393 (PAC), 2013 U.S. Dist. LEXIS 44091 (S.D.N.Y. Mar. 27, 2013).....................15

*Babin v. Stantec, Inc.,*
    2010 U.S. Dist. LEXIS 88009 (E.D. Pa. Aug. 25, 2010)...............................................................20

*Bramble v. Wal-Mart Stores, Inc.,*
    09-cv-4932, 2011 U.S. Dist. LEXIS 39457 (E.D. Pa. Apr. 12, 2011) .........................17, 19, 20, 24

*Burkhart-Deal v. Citifinancial, Inc.,*
    No. 07-1747, 2010 U.S. Dist. LEXIS 9534 (W.D. Pa. Feb. 4, 2010) ...........................................16

*Cuzco v. Orion Builders, Inc.,*
    477 F. Supp. 2d 628 (S.D.N.Y. 2007) .........................................................................................16

*Dejesus v. HF Mgmt. Servs., Inc.,*
    No. 12-4565, slip op. (2nd Cir. Aug. 5, 2013) .............................................................................16

*Diaz v. Elecs. Boutique of Am., Inc.,*
    No. 04-CV-0840E(Sr), 2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 13, 2005) .................14, 24

*DiBlasi v. Liberty Mut. Ins. Group Inc.,*
    Case No. 1:12-cv-10967-RGS, 2014 U.S. Dist. LEXIS 45898 (D. Mass. Apr. 3, 2014)...............20

*Ferreira v. Modell's Sporting Goods, Inc.,*
    Civ. No. 11-2395 (DAB), 2012 U.S. Dist. LEXIS 100820 (S.D.N.Y. July 16, 2012)...................22

*Guillen v. Marshalls MA, Inc. (Guillen I),*
    750 F. Supp. 2d (S.D.N.Y. 2010)...............................................................................19, 21, 23, 24

*Guillen v. Marshalls of MA, Inc. (Guillen II),*
    841 F. Supp. 2d 797 (S.D.N.Y. 2012) ................................................................................ passim

*Guillen v. Marshalls of MA, Inc. (“Guillen III”),*
    No. 09 Civ. 9575 (LAP) (GWG), 2012 U.S. Dist. LEXIS 91639 (S.D.N.Y. July 2, 2012)
    (Preska, C.J.) .......................................................................................................................15, 22

# TABLE OF AUTHORITIES
## (CONTINUED)

PAGE

*Harriel v. Wal-Mart Stores, Inc.*,
   2012 U.S. Dist. LEXIS 97527 (D.N.J. July 13, 2012)..........................................................13, 19

*Hoffmann-LaRoche, Inc. v. Sperling*,
   493 U.S. 165, 169 (1989) .........................................................................................................14

*Hunter v. Sprint Corp.*,
   346 F. Supp. 2d 113 (D.D.C. 2004) ........................................................................................15

*Ikikhueme v. CulinArt, Inc.*,
   No. 1:13-cv- 00293 (JMF), 2013 U.S. Dist. LEXIS 77720 (S.D.N.Y. June 3, 2013)....................15

*Jenkins v. TJX Cos., Inc.*,
   853 F.Supp.2d 317 (E.D.N.Y. 2012).......................................................................14, 15, 19, 20

*Laroque v. Domino's Pizza, LLC*,
   557 F. Supp. 2d 346 (E.D.N.Y. 2008).....................................................................................16

*McGlone v. Contract Callers, Inc.*,
   867 F. Supp. 2d 438 (S.D.N.Y. 2012) .....................................................................................14

*Myers v. Hertz*,
   624 F.3d 537 (2d Cir. 2010) ........................................................................................... passim

*Neary v. Metro. Prop. & Cas. Ins. Co.*,
   517 F. Supp. 2d 606 (D. Conn. 2007) .....................................................................................16

*Ramirez v. Yosemite Water Co., Inc.*,
   20 Cal. 4th 785 (1999) .............................................................................................................25

*Vargas v. HSBC Bank USA, N.A.*,
   2012 U.S. Dist. LEXIS 113993 (S.D.N.Y. Aug. 9, 2012) ...........................................................24

*Vasquez v. Vitamin Shoppe Indus. Inc.*,
   2011 U.S. Dist. LEXIS 74376 (S.D.N.Y. July 11, 2011) ....................................................21, 24

## STATUTES

29 U.S.C. § 213(a)(1)...........................................................................................................................16

29 U.S.C. § 216(b)...............................................................................................................................14

**TABLE OF AUTHORITIES**
(CONTINUED)

PAGE

**OTHER AUTHORITIES**

29 C.F.R. § 541.100(a)............................................................................................17

29 C.F.R. § 541.102...................................................................................................6

29 C.F.R. § 541.200(a)............................................................................................17

## INTRODUCTION

Plaintiffs Amanda Costello and Loniece Reed, two salaried former Assistant Store Managers who admittedly failed to perform the exempt management duties they knew were expected of them, ask this court to intervene on their behalf and conditionally certify a class of more than 3,500 current and former Kohl's Apparel & Accessories Assistant Store Managers ("AA ASMs") and Children's, Footwear & Home Assistant Store Managers ("CFH ASMs") (together, "ASMs") who worked in 1,160 stores *nationwide*.  To obtain conditional certification, Costello and Reed must establish, through actual evidence (*not* unsupported assertions), that they are "similarly situated" such that they and potential opt-ins "together were the victims of a common policy or plan that violated the law." *Myers v. Hertz*, 624 F.3d 537, 555 (2d Cir. 2010).  Their factual proffer does not remotely satisfy their burden.

Costello and Reed suggest that they and the proposed class are similarly situated because Kohl's maintained a single ASM job description, classified all ASMs exempt, maintained policies and training applicable to all ASMs, and because they claim not to have performed exempt management duties.  These same arguments, however, have been rejected numerous times by this Court in a series of nearly identical cases involving "big box" retailers, including in a decision by the Chief Judge.  Here, as there, there is nothing illegal about Kohl's job description, its classification of ASMs, or its policies and training.  Moreover, it is starkly apparent from the record in this case, including the Plaintiffs' deposition testimony, that none of Costello, Reed, the opt-in Plaintiffs, or their ASM peers performed their jobs the same way, rendering them anything but similarly situated.  Indeed, though both Reed and an opt-in Plaintiff testified that they failed to perform management duties, they also represented to others via admittedly truthful resumes that they *did* perform management duties.  On this record, where contradictions between plaintiffs' claims and their testimony leaves them with an irreconcilable jumble of inconsistent statements that cannot serve as representative proof for themselves, let alone the class they seek to represent, they are not similarly situated and their motion must be denied.

## STATEMENT OF FACTS

**A.    Kohl's Structure, Business Operations and Retail Store Hierarchy**

Kohl's is one of the nation's largest retailers, operating more than 1,150 specialty department stores in 49 states.  *See* Deposition of Genevieve Shields ("Shields Dep.") 36.[1]  Kohl's currently employs approximately 14,500 full-time associates and 102,000 part-time associates in its stores.  *See* Declaration of Genevieve Shields ("Shields Decl."), Ex. B to Black Decl., ¶ 3.  Kohl's stores are divided across four geographic Territories, each subdivided into 18 Regions.  Shields Dep. 36-38.  Kohl's Regions are divided into 91 Districts, each of which contains about 12 to 14 retail stores.  *Id.* Each distinct Territory, Region, and District is managed by a Kohl's executive, and each store is the management responsibility of a team of Store Executives, including a Store Manager and a group of Assistant Store Managers.  *Id.* 40, 45; Shields Decl. ¶ 4; Kohl's Store Org. Charts, Ex. C, Black Decl.

Among other critical distinctions, Kohl's stores are differentiated by sales volume, which is used to set diverse staffing models.  *See* Shields Dep. 38-39.  Depending on a store's sales volume and location, anywhere from two to four salaried Assistant Store Managers, each of whom reports directly to a Store Manager, have responsibility for managing unique sales areas and/or operations functions of the store.  *See* Shields Dep. 45; Ex. C, Black Decl.  These Assistant Store Managers include:

- **AA ASM** (responsible for the management of an area of the store housing all apparel and accessories departments, including Misses, Men's, Junior's, Jewelry, Intimates, and Beauty, and which generates a range of approximately $4.0M to $18.2M in annual sales volume; directly responsible for the supervision, on average, of anywhere from approximately 20 to 60 Kohl's associates);

- **CFH ASM** (responsible for the management of an area of the store housing all other Kohl's sales departments not included within Apparel & Accessories, including Children's, Home, Housewares, Domestics, and Shoes, and which generates a range of approximately $2.6M to $12.2M in annual sales volume; directly responsible for the supervision, on average, of anywhere from approximately 30 to 35 Kohl's associates);

---

[1] Exhibit A to the Declaration of Richard W. Black ("Black Decl.").  Cited excerpts of the Shields Dep. and other depositions cited in this memorandum are annexed as Exhibits to the Black Decl.

- **Operations/CFH ASM** ("Ops/CFH ASM") (responsible for the management of store operations functions and the management of the CFH departments);

- **HR/Operations Assistant Store Manager** (HR/Ops ASM") (responsible for both the management of operations and human resources functions of the store); and

- **Freight Overnight Assistant Store Manager** ("Overnight Freight ASM") (responsible for the management of store freight operations and overnight operations).[2]

*See* Ex. C, Black Decl.; Shields Decl. ¶¶ 5-10.  For example, in 2013, stores with less than $16M in annual sales were overseen by 3 Store Executives (a Store Manager, an AA ASM, and an Ops/CFH ASM), stores with between $16M and $24M in annual sales volume were overseen by 4 Store Executives (a Store Manager, an AA ASM, a CFH ASM, and an HR/Ops ASM), and stores with more than $24M in annual sales were overseen by 5 Store Executives (a Store Manager, an AA ASM, a CFH ASM, an HR/Ops ASM, and an Overnight Freight ASM).  Ex. C, Black Decl.

Depending on sales volume, store location and store layout, Kohl's stores are also staffed with an assortment of full- and part-time hourly area and department supervisors, and sales specialists.  These individuals supervise specific departments or store functions, and report directly to either the CFH ASM or the AA ASM.  *Id.* To the extent they exist in a store, the AA Area Supervisor, Misses Supervisor, Men's Supervisor, Junior's Supervisor, Misses/Juniors Supervisor, Jewelry Supervisor, Jewelry Specialist, and Intimate/Access Specialist positions each report directly to the AA ASM.  *Id.* To the extent they exist at a store, the CFH Area Supervisor, Housewares Supervisor, Domestics Supervisor, Kids Supervisor, Shoes Specialist, and Ad Set Supervisor[3] positions each report to the CFH

---

[2] Plaintiffs seek certification of a FLSA collective consisting only of AA ASMs and CFH ASMs. That other Assistant Store Manager positions exist is critical, though, because the presence (or absence) of other types of Assistant Store Managers in a Kohl's store impacts how an ASM performs the job.  For example, in stores with an Overnight Freight ASM, the management of freight and merchandise for particular Kohl's departments is the responsibility of that manager. However, in a store without an Overnight Freight ASM, managing freight and merchandise is the responsibility of ASMs for the department where the freight will be sold.  *See* Declaration of Brian R. Dalias ("Dalias Decl."), Ex. D to Black Decl., ¶ 36.

[3] The Ad Set Supervisor position provides a prime example of the way in which the staffing of a Kohl's store results in different ASMs performing their jobs in different ways.  In stores with annual sales volume of $16-24M, the Ad Set Supervisor (responsible for ensuring the accuracy of pricing and advertising for the entire store) reports directly to the CFH (cont'd)

ASM.  *Id.*  CFH ASMs and AA ASMs also supervise dozens of part-time Sales Associates in an area of the store responsible for millions of dollars in annual sales.[4]  Shields Dep. 46; Shields Decl. ¶¶ 6-7.

Operationally, Kohl's stores also differ from one another based on numerous factors, including a store's location, size, physical layout, and "climate", the number of Kohl's Store Executives who manage the store's operations, the management style of the Store Manager, and the relative experience and skills of the Store Executive team and those who report to them.  Shields Decl. ¶ 11; Shields Dep. 39-40.  For example, some Kohl's stores are located in shopping malls while others exist as standalone buildings, and still others are located in strip malls.  Shields Decl. ¶ 13.  Kohl's stores, though always large among retail establishments, vary greatly in physical size – from 54,500 sq. ft. to 156,654 sq. ft.  *Id.* ¶ 14.  The layout of Kohl's stores vary, with some built by Kohl's long ago, others newly built or remodeled, and others acquired or leased by Kohl's after being occupied by other retailers.  *Id.* ¶ 15.  Stores also offer different products depending on whether the store is in a "cold", "mild", "hot" or "super hot" geographic climate.  Shields Dep. 39-40; Shields Decl. ¶ 12.

**B.**     **Plaintiffs'[5] Employment With Kohl's**

Costello was employed by Kohl's as a CFH ASM in Woodbury, New York and Walkill, New York until December 2012, when her employment was terminated following her continued,

---

ASM, who is ultimately responsible for managing those functions. Ex. C, Black Decl. However, in stores with between $24-28M in sales, the Ad Set Supervisor reports to the Overnight Freight ASM. *Id.*

[4] *See also* Dalias Decl. ¶¶ 18, 21 (as AA ASM, supervised 35 to 65 associates and was responsible for between $9M and $16 in annual sales volume); Declaration of Melissa A. Harris ("Harris Decl."), Ex. E, Black Decl., ¶ 15 (as AA ASM and CFH ASM, supervised 9 to 10 supervisors and specialists, and dozens of sales associates); Declaration of Stephen Kingsbury ("Kingsbury Decl."), Ex. F, Black Decl., ¶ 15 (as CFH ASM, supervised 10 to 20 hourly associates and supervisors); Declaration of Detra Wilson ("Wilson Decl.") , Ex. G, Black Decl., ¶18 (as AA ASM, supervises 15 to 20 hourly supervisors and associates);Declaration of Kymberly Bailey ("Bailey Decl."), Ex. H, Black Decl., ¶ 11 (as AA ASM, supervises approximately 35 hourly associates);Declaration of Brean Weldon ("Weldon Decl."), Ex. I, Black Decl., ¶ 9 (as AA ASM, supervises 15 to 25 hourly associates and supervisors).

[5] As used herein, "Plaintiffs" refers collectively to Costello and Reed, and the five other former ASMs who have consented to join this action: Vonda Backhaus, Homer Alexander, Yuri Escoto, Londrell Land and Lynn Snyder.  Unlike Backhaus and Alexander, who joined the case shorty after it was filed and were subject to written discovery and deposed, Escoto and Land joined only after pre-conditional certification discovery had closed.  (Dkt. 33-34).  Nonetheless, Plaintiffs offer declarations from Escoto and Land to support their Motion.  Snyder joined just 10 days ago, on May 20, 2014.  (Dkt. 45).

documented poor job performance, including her managerial failures to direct, supervise, train and develop her associates and to react to sales trends.  *See* Deposition of Amanda Costello ("Costello Dep.") 38-39, 129, Ex. J, Black Decl.; Costello Exec. Counseling Form, Ex. K, Black Decl.  Reed worked as a CFH ASM and AA ASM in Stafford, Virginia and Culpeper, Virginia from August 2008 to March 2010, at which time she voluntarily resigned her position. *See* Deposition of Loniece Reed ("Reed Dep.") 69, 134-36, 188, Ex. L, Black Decl.[6]  During their employment, neither Costello nor Reed complained, through Kohl's toll-free ethics hotline or otherwise, about their exempt classification or salary.   Costello Dep. 81-82; Reed Dep. 85-86; *see also* Alexander Dep. 83 (no complaint); Backhaus Dep. 86-87 (same).  Each decided only after leaving Kohl's that they were misclassified.

**C.     Evidence of Material Differences In The Performance of The ASM Position**

   **1.     The ASM Job Description, Management Training, and Kohl's Corporate Policies Make Clear ASMs are Managers.**

      **a.     The ASM Job Description**

   Kohl's expectations of ASMs are described in its ASM job description, and none of these duties and responsibilities are non-managerial in nature.  Indeed, the job description emphasizes the primary "responsibility of management and supervision of all [store] Associates . . . including leading the Store [with respect to] [a]ssociate development, supervision of merchandise sales areas to ensure execution according to Kohl's Best Practices, communications, analysis of business operations,

---

[6] Opt-in Plaintiff Homer Alexander was hired by Kohl's in July 2010 as an Area Supervisor, after significant retail management experience as a former "big box" Store Manager and Assistant Store Manager.  *See* Deposition of Homer Alexander ("Alexander Dep."), Ex. M, Black Decl., 37-40, 85.  Alexander was promoted in March 2011 to a CFH ASM position in Albuquerque, New Mexico before voluntarily resigning in February 2012.  *Id.*  Opt-in Plaintiff Vonda Backhaus worked as an AA ASM in Kohl's Wausau, Wisconsin store location from November 2000 to April 2012, when she voluntarily resigned.  *See* Deposition of Vonda Backhaus ("Backhaus Dep."), Ex. N, Black Decl., 31, 129-30.  Opt-in Plaintiff Yuri Escoto was hired by Kohl's in May 2011, and was a CFH ASM in Eagan, Rosedale, Maplewood and Rogers, Minnesota from January 2012 until her resignation in April 2013.  *See* Declaration of Yuri Escoto ("Escoto Decl."), ¶ 1, Dkt. 44-8.  Opt-in Plaintiff Londrell Land was a CFH ASM from July 2007 to 2010, and an AA ASM from 2010 to May 2013, in Greenville, North Carolina before resigning in May 2013.  *See* Declaration of Londrell Land ("Land Decl."), ¶ 2, Dkt. 44-9.  Opt-in Plaintiff Lynn Snyder was an AA ASM in Kohl's stores in Wheeling, West Virginia and Washington, Pennsylvania from June 2007 until August 2012, when her employment was terminated for poor performance.  Shields Decl. ¶ 16.

expense management, and general management of the store as part of the Store Management Team."
*See* May 2010 and March 2012 ASM Job Descriptions, Dkt. 44-3.   Though the nature of the management duties ASMs perform varies from ASM to ASM depending on the store in which they work, the job description enumerates myriad responsibilities to be performed by ASMs, which are unmistakably managerial.  *Id.*  These duties include all of the classic "indices" of supervision,[7] like "lead[ing]" and "direct[ing]" the work of Area Supervisor, Supervisor, and Associate teams", and:

- assisting in leading efforts to train Associates;
- coaching and counseling Associates;
- completing and administering Associate counseling documentation;
- completing and administering annual Associate reviews;
- developing and coaching Area Supervisors to promotable levels or to assume larger areas of responsibility;
- ensuring that Associates adhered to Kohl's ethical standards and policies;
- participating in the Associate hiring process;
- supervising Associates to complete price changes and returns; and
- interpreting, directing and leading capacity and merchandise directives;
- reviewing business summary reports for sales opportunities;
- partnering with Loss Prevention on inventory programs;
- leading store meetings and ensuring action plans are achieved; and
- resolving escalated customer complaints.

*Id.*  In addition, ASMs in stores with four or five Store Executives have added responsibility for leading Associates in the execution of certain Operations, and for performing Operations functions, including:

- managing payroll projections, productivity, and expenses given sales trends;
- reviewing scheduled vs. workload reports; editing schedules to reflect proper workload;
- leading the inventory planning and ensuring execution; and
- assisting in leading the total store freight team to ensure the store follows Kohl's best practices and standards; and driving store productivity.

*Id.*  The managerial nature of ASM positions is exemplified by the fact that Kohl's explicitly directs its ASMs to delegate manual, non-exempt tasks to Area Supervisors and other hourly, non-exempt positions, including, for example, recovering the floor and fitting rooms, working cash registers,

---

[7] *See* 29 C.F.R. § 541.102.

covering the service desk, setting store ads, and processing freight.  *Id.*  ASMs are also explicitly told that, to the extent they must perform non-management duties, those instances should be limited to situational coaching with the dual purpose of providing education and development to Associates.  *Id.*  Costello and Reed admit they received a copy of the ASM job description, and understood that as ASMs, they were expected to perform the tasks set forth in the description.  Costello Dep. 197-99; Reed Dep. 237-39; *see also* Backhaus Dep. 165-66.

### b.     Kohl's Comprehensive and Flexible ASM Training

Newly-hired and newly-promoted Kohl's ASMs undergo extensive, yet *flexible*, management-specific training which differs depending on the individual's prior experience and knowledge prior to entering the CFH ASM or AA ASM position.  *See* Deposition of Sharon Myhre Loomis ("Loomis Dep."), Ex. O, Black Decl., 16, 30, 34, 43, 47-50, 55-58, 61-62.  Initial and ongoing ASM management training at Kohl's is designed to provide ASMs with a foundation and understanding of the tools and resources available to their position and is intended to be used by the individual ASM to aid in making "the decisions that are right for their unique circumstances and their unique building."  *Id.* 48, 55-57, 61-62. All training reinforces Kohl's expectation that management is an ASM's primary duty.

Contrary to Plaintiffs' claim that all Kohl's ASMs receive the *same* training, Kohl's ASMs receive varied management training, much of which is self-determined.   With regard to initial management training, some members of the putative ASM collective received training through a program called "Lead Off", while others received training through a different program called "New Executive Learning Experience", while still others, who were promoted from within, received training through a combination of different programs, including "Advancing Into Management" ("AIM").[8]  *Id.* 36-37, 47, 59.  Some received 12 weeks of Lead Off training, while others took only a truncated 4-

---

[8] A review of the modules that comprise the Lead Off, New Executive Learning Experience, and AIM management training demonstrates that these trainings were not uniform (or uniformly applied to new ASMs).  Exs. P, Q, and R, Black Decl.

week Lead Off course depending on their individual needs and pre-existing management experience. *Id.* 47.  Still others took only a portion of initial management training because the needs of the store to which they were assigned required that they start in the position sooner than expected.  *See, e.g.*, Dalias Decl. ¶¶ 24, 26 (ASM received only 10 weeks of Lead Off before starting ASM position); *see also* Wilson Decl. ¶ 6 (6-week initial management training); Bailey Decl. ¶ 7 (4 weeks of initial training given prior retail management experience); Weldon Decl. ¶ 6 (initial 6-week AIM training ).

ASMs also receive both mandatory training and diverse elective management training, including, for example:

- <u>Leadership: Leading Versus Doing</u>: Training related to leadership, including specific guidance on the Company's expectation that ASMs spend at least 70% of their time managing and leading, and only 30% or less of their time performing non-exempt tasks that Associates might perform.  Ex. S, Black Decl.

- <u>Coaching & Company Guidelines</u>:  Training relating to ASMs' responsibility to coach, counsel and develop the associates who report to them.  Ex. T, Black Decl.

- <u>Effective Performance Feedback Participant Guide</u>: Providing targeted training to ASMs related to their responsibility to draft and issue annual written performance evaluations to Associates.  Ex. U, Black Decl.; and

- <u>Business Acumen</u>:  Providing targeted training to aid ASMs in reviewing and analyzing business reports to evaluate sales performance in their areas, and to assist them in strategizing on how to best drive sales.  Ex. V, Black Decl.

The named and opt-in Plaintiffs' ASM training records demonstrate that each has taken different management training.  *See, e.g.,* Costello and Reed Training Records, Exs. W and X, Black Decl. (Costello took Leadership: Leading Versus Doing training while Reed did not); *compare* Reed Dep. 159-68 with Alexander Dep. 42-44, 121-24 (Reed took 10-week MIT training after college graduation; Alexander received no initial ASM training after his promotion).

Far from mandating uniform training, Kohl's provides ASMs with an opportunity to self-direct their individual management training based on their individual needs, their unique store, and those they

manage.  *See, e.g.,* Dalias Decl. ¶¶ 24-28 (self-selected elective management training to assist in developing in his role within the company); Harris Decl. ¶¶ 18-19 (selected management training courses based on "what I believed were my individual needs as a manager were, and what I thought the needs were of the area of the store I was managing.").  Plaintiffs suggest that the fact "[a]ll ASMs have access to the Kohl's intranet where training materials are contained" shows that Kohl's management training is uniform to all ASMs.  The actual record shows this claim is unfounded.  Rather, Kohl's makes management training materials available online to ASMs so they can choose courses that suit their individual training needs based on their unique experiences.  *See* Loomis Dep. 55-57.

### c.    Kohl's guideposts further define ASMs' management role

Like all major retailers, Kohl's maintains policies and procedures that guide store operations. For example, Kohl's maintains policies relating to additional ASM management responsibilities, including reviewing associates schedules and approving time-off requests, and ensuring associate compliance with Kohl's policies and legal requirements, including those relating to recording time worked.  *See, e.g.*, "ASSETS Roles and Responsibilities", Ex. Z, Black Decl.; Recording Hours Worked, Ex AA, Black Decl.  Although ASMs are expected to comply with established policies and procedures, they are also expected to "interpret policies and apply them to their specific buildings and their specific Associates and customers."  Shields Dep. 121-22; *see also See* Deposition of Kevin Mantz ("Mantz Dep."), Ex. Y, Black Decl., 29-31 (policies, including best practices "are not intended to be a A to Z detailed instruction manual on how the store executes those processes" but instead up to the ASM to "interpret and apply" them).[9]

---

[9] Plaintiffs quote Kohl's corporate testimony to suggest that policies, training, and ASM job description are "uniform" and "apply to all ASMs nationwide" (Dkt. No. 43 at 4-8), but fail to include the testimony of those same witnesses that how ASMs interpret and apply policies, training, and the job description is unique to them depending on a range of factors. Moreover, the testimony of Costello's and Reed's ASM peers makes clear that, to manage their particular area, they were authorized to, and did, deviate from operations and merchandising guides provided by Kohl's (including Kohl's Communications Books and Best Practices) to fit the needs of their particular store at any given time.  Dalias Decl. ¶ 61; (cont'd)

**2.      _Costello's and Reed's View_: Contradictory Plaintiffs' Testimony and The Failure to Perform According to Kohl's Expectations.**

Costello and Reed argue that a nationwide FLSA collective should be conditionally certified because they are "similarly situated" to each other, _and to the ASMs they seek to represent._  Their own testimony and documents demonstrate, however, that the duties they claim to have performed differ from each other and their peers, and that each performed their jobs in a unique way.  Indeed, if their deposition testimony is believed, they did not perform the duties they admit Kohl's expected of them.

As an initial matter, Costello and Reed acknowledge that Kohl's expected them to perform the wide range of management duties set out in the ASM job description.  Costello Dep. 197-99; Reed Dep. 237-39.  Nonetheless, each testified that they failed to do so.  Reed, for her part, renounced having performed nearly _any_ management or supervisory tasks as an ASM, testifying under oath that, despite being the manager of a Kohl's retail area that generated _millions_ of dollars per year in sales and employed dozens of full- and part-time area and department supervisors and associates, she actually supervised _zero_ Kohl's employees and had no more management responsibility than the most recently hired, least-tenured part-time sales Associate in the store.  Reed Dep. 144-45, 194-95, 208-10, 277.[10] By comparison, while Costello also generally sought to disclaim her management responsibilities, she conceded that, unlike Reed, she delivered performance evaluations to associates, was responsible for

---

Harris Decl. ¶ 53-54; Kingsbury Decl. ¶ 12; Bailey Decl. ¶ 38-43; Weldon Decl. ¶ 31.  Moreover, though Costello and Reed suggest that Kohl's KPlanner makes the way ASMs perform their jobs uniform, ASMs actually use KPlanner to plan and assign work based on their individual stores.  Harris Decl. ¶ 20; Bailey Decl. ¶ 13; Weldon Decl. ¶ 12; Mantz Dep. 61.

[10] Reed's deposition testimony is particularly incredible given her resume, authored by her and admittedly truthful and accurate, represented to potential employers that she was "[r]esponsible for overseeing and managing sales, credit, customer service, human resources, inventory, and expense management operations", "[r]ecommended the disposition and redistribution of excess supply; and evaluated and approved store products displays and advertising", [m]anaged product accountability and conducted price analysis", "[i]nterpreted and analyzed data extracts and reports", "[a]nalyzed sales transactions data, prepared reports, and file[d] expense accounts", "[t]rained and advised employees of company procedures, policies, and job duties", "[i]nterviewed candidates for vacant positions", "performed management duties for 50% of the store", and "[s]upervised employees and prepare[d] work schedules for over 20 employees", among other exempt management duties.  _See_ Ex. BB, Black Decl; Reed Dep. 37, 233-36.  Reed's resume should not be lightly dismissed as it constitutes the admissions of a party opponent and directly contradicts her sworn testimony.

enforcing Kohl's policies and addressing associate concerns, and coached associates.  Costello Dep. 143, 229, 235-36.

The testimony of opt-in Plaintiffs Backhaus, Alexander, Escoto and Land, juxtaposed against the testimony of Costello and Reed, and each other, also demonstrates that they did not perform the ASM role the same way.  For example, while Costello, Backhaus, and Alexander all admittedly performed E3 duties – in which they were the "manager-on-duty" for the entire store – for several hours a day, multiple times a week, Escoto contrarily claims she "spent approximately 90-95% of [her] time performing hourly tasks" and Land claims he spent "approximately 85-90% of [his] time" doing the same.  Reed Dep. 304 (E3 duty 12-20 hours a week); Alexander Dep. 162-63 (4-5 days a week, up to 8 hours a day); Costello Dep. 268-69 (every shift, 3 to 9 hours); Backhaus Dep. 261 (5 days, 2-4 hours a day); Escoto Decl. ¶ 5; Land Decl. ¶ 5.[11]  Moreover, Backhaus and Alexander testified that they issued formal counseling and discipline notices to associates; Costello and Reed did not. Backhaus Dep. 214; Alexander Dep. 221-22; Costello Dep. 229; Reed Dep. 270.  Backhaus and Alexander assigned and delegated work to associates; Costello and Reed rejected the idea they did so. Backhaus Depo. 267; Alexander Dep. 178, 184-85; Costello Dep. 230; Reed Dep. 291-92.  Costello and Reed disclaimed supervisory authority over hourly associates, while Backhaus acknowledges that she did supervise hourly associates.  Backhaus Dep. 191; Reed Dep. 144-45; Costello Dep. 230. Backhaus conducted annual Associate performance reviews and 90-day performance reviews, Costello delivered performance evaluations to approximately 10 associates annually, but Reed never participated in the performance review process. Backhaus Dep. 222, 241-42; Costello Dep. 236; Reed Dep. 218.  Alexander and Backhaus actively participated in hiring by interviewing candidates and providing feedback.  Alexander Dep. 180-81; Backhaus Dep. 201-04.  Costello and Reed participated

---

[11] Escoto and Land have submitted "cookie-cutter" declarations that are, in pertinent part, nearly verbatim identical.  *Compare* Escoto Decl. ¶¶ 5,7 *with* Land Decl. ¶¶ 5,7.

in just one interview, after which Reed claims to have provided written feedback, and Costello claims not to have been solicited for feedback.  Costello Dep. 211; Reed Dep. 248-50.

Making it even more apparent that there is no agreement among the Plaintiffs as to how they actually performed the ASM job, Reed and Backhaus each produced resumes that contradict their own deposition testimony regarding their ASM duties *and*, if believed to be accurate (both Reed and Backhaus testified that they were), stand in stark contrast to the testimony of their co-Plaintiffs.  Reed Dep. 234-36; Backhaus Dep. 29-39.[12]  Backstopped against these dissimilarities is one critical and consistent undisputed fact: Plaintiffs have *no personal knowledge* about how ASMs in other parts of the country perform their jobs.  Alexander Dep. 59 ("How am I supposed to know what they do at other stores?  I can only speak to what happened at the stores that I've worked at"); *see also* Reed Dep. 243, 247; Costello Dep. 206-07, 212; Backhaus Dep. 94, 159; Escoto Decl. (failing to set forth any personal knowledge of how other ASMs perform their jobs); Land Decl. (same).  The deep differences in Plaintiffs' duties demonstrate they cannot even offer representative proof to cover their small sampling, much less the class of thousands nationwide they seek to represent, and no reasonable inference can be drawn that Plaintiffs are similarly situated.

### 3. *Plaintiffs' Peers*: Corroborating ASMs' Primary Duty of Management

Plaintiffs' peers – *the ASMs they purport to represent* – likewise paint a contrasting portrait of

---

[12] Backhaus' resume also contradicts her deposition testimony.  In it, she represents that, among other duties, she: "[m]anaged the majority of the store", "serve[d] as the Store Manager in the absence of the manager", "[d]irect[ed] and supervise[d] [a] team of six managers and 60 associates throughout the store", had responsibility for "staff direction, payroll expense, productivity, merchandising and freight flow, point of sale, customer service, receiving, store common areas, and loss prevention", analyzed business sales reports "to determine if inventory levels are adequate and merchandise placement is following the plan", "[l]ead monthly staff meetings with 30 associates", and presented "at staff meetings throughout the district on topics such as how to motivate and improve staff performance and productivity." *See* Ex. CC to Black Decl. Backhaus' performance reviews, much of which she authored for her Store Manager's review, also state that she performed a many management duties that her co-plaintiffs disavow having performed.  Backhaus Dep. 254-56 ("Vonda does a good job of structuring team activities.  She always sets goals, clarifies roles, and responsibilities and suggests process steps to help the team work more effectively"; "Vonda gives very timely and consistent feedback"; "Vonda can be counted on to address and resolve problems that develop in her area of responsibility"; "I am comfortable using my resources to develop my team.  I have partnered with human resources to help me coach a team player"). *See* Backhaus Appraisal, Ex. DD, Black Decl.

ASMs' job duties.[13] They spend only a small percentage of time performing the non-management duties Costello and Reed claim consumed most of their time, and they remain responsible for supervising associates even when performing those duties.[14] The testimony of these ASMs flatly contravenes the claim that Plaintiffs, and all ASMs nationwide, primarily performed non-management duties. They identify specific, hands-on examples of how they uniquely manage multi-million dollar businesses (the areas within their individual stores), plan, direct and supervise the work of dozens of full- and part-time supervisors and associates, use *and interpret* guides and tools provided by Kohl's, and enforce Kohl's policies, among other management duties, on a day-to-day basis.[15]

Moreover, the testimony of these ASM peers makes clear that how they performed their jobs differed over time based on numerous factors, including sales volume, store layout, store location, staffing, the management style of the Store Manager to whom they reported, and the experience levels and expertise of the other Store Executives and the Associates who reported to them.[16] The record makes clear that even ASMs serving in nearly the *same* role at the *same* time in the *same* store perform their jobs differently, as Reed's former colleague at Kohl's Culpeper, Virginia store testified that she spent the majority of her time performing a wide range of management duties as the store's CFH ASM at the same time that Reed claims to have performed none as the AA ASM.[17]

---

[13] Kohl's offers declarations from Plaintiffs' ASM peers not for the purpose of resolving the merits of ASM's classification status, but rather to demonstrate the differences in those Plaintiffs' purport to represent prevent a finding of "similarly situated". *See Guillen v. Marshalls of MA, Inc. (Guillen II),* 841 F. Supp. 2d 797, 803 (S.D.N.Y. 2012) ("[i]t would be a waste of the Court's time and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated.") (internal quotations and citations omitted). *See also Harriel v. Wal-Mart Stores, Inc.,* 2012 U.S. Dist. LEXIS 97527, at *19 (D.N.J. July 13, 2012) (recognizing that Wal-Mart's assistant manager declarations supported its "contention that 'Plaintiff's claimed work experiences differ significantly not only from the corporate documents Plaintiff points to as common to the OAM position, but also from the work experience of other OAMs.'").

[14] Harris Decl. ¶ 24; Dalias Decl. ¶ 41; Bailey Decl. ¶ 17; Weldon Decl. ¶ 14.

[15] Dalias Decl. ¶¶ 11, 29-63; Harris Decl. ¶¶ 20-57; Bailey Decl. ¶¶ 12-43; Kingsbury Decl. ¶¶ 8-28; Weldon Decl. ¶¶ 9-31; Wilson Decl. ¶¶ 9-32.

[16] *See, e.g.,* Dalias Decl. ¶¶ 11-22, 34-39, 55; Bailey Decl. ¶ 44; Kingsbury Decl. ¶ 29.

[17] Harris Decl. ¶¶ 12, 20-57.

On this record, Costello and Reed cannot satisfy their burden to prove, based on evidence other than their own unsupported assertions, that how they actually perform the ASM job is the same as those they seek to represent. Thus they are not "similarly situated" and their motion should be denied.

## LEGAL ARGUMENT

### A.  Authorization Of Notice Under The FLSA Is Discretionary And Should Only Be Granted In "Appropriate" Cases

The FLSA does not expressly authorize the judicial intervention Costello and Reed seek. It simply permits individuals to bring an action for unpaid overtime on behalf of themselves "and other employees similarly situated." 29 U.S.C. § 216(b). To proceed collectively, plaintiffs must first procure conditional certification of their FLSA claims, and such "certification is not automatic." *Jenkins v. TJX Cos., Inc.*, 853 F.Supp.2d 317, 322 (E.D.N.Y. 2012); *McGlone v. Contract Callers, Inc.*, 867 F. Supp. 2d 438, 443 (S.D.N.Y. 2012). Indeed, in *Hoffmann-LaRoche, Inc. v. Sperling*, the Supreme Court held that district courts "have discretion, *in appropriate cases* . . . to implement" the collective action mechanism under Section 216(b) "by facilitating notice to potential plaintiffs." 493 U.S. 165, 169 (1989) (emphasis added); *Myers*, 624 F.3d at 555 n.10 (nothing in the FLSA requires court-authorized notice, although it "may be a useful 'case management' tool for district courts to employ in 'appropriate cases'"). In support, the Supreme Court pointed to the systemic benefits derived from a process that permits the "efficient resolution in one proceeding of common issues of law and fact arising from the *same alleged . . . activity*." *Id.* at 170, 172-74 (emphasis added). This Court must decide, therefore, whether this is an "appropriate" case to issue notice, regardless of the standard applied. Kohl's contends it is not.

Costello and Reed bear the burden of demonstrating that they are "similarly situated" to members of the proposed FLSA collective. *Diaz v. Elecs. Boutique of Am., Inc.*, No. 04-CV-0840E(Sr), 2005 U.S. Dist. LEXIS 30382, at *10 (W.D.N.Y. Oct. 13, 2005) (citing *Hoffmann v.*

*Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)).  The requirement that they be similarly situated with other members of the class "ensures that the collective action promotes the 'efficient resolution of common issues of law and fact arising from the same allegedly discriminatory activity'." *Hunter v. Sprint Corp.*, 346 F. Supp. 2d 113, 119 (D.D.C. 2004) (quoting *Hoffman-LaRoche*, 493 U.S. at 170). In *Myers*, the Second Circuit held that named plaintiffs must "make a 'modest factual showing' that they and potential opt-ins 'together were the victims of a common policy or plan *that violated the law*.'" 624 F.3d at 555 (emphasis added); *see also Jenkins*, 853 F.Supp.2d at 322 (to satisfy burden, plaintiffs must identify "some identifiable factual nexus which binds [them] and potential class members together as victims of a particular practice.").  The Second Circuit cautioned, however, that although this "should remain a low standard of proof," the required factual showing "cannot be satisfied simply by 'unsupported assertions.'" *Myers*, 624 F.3d at 555. "The factual showing, even if modest, must still be based on some substance." *Ali v. New York City Health and Hosp. Corp.*, No. 11 Civ. 6393 (PAC), 2013 U.S. Dist. LEXIS 44091, at *5 (S.D.N.Y. Mar. 27, 2013); *see also Guillen v. Marshalls of MA, Inc.* ("*Guillen III*"), No. 09 Civ. 9575 (LAP) (GWG), 2012 U.S. Dist. LEXIS 91639, at *4 (S.D.N.Y. July 2, 2012) (Preska, C.J.) (recognizing, in the "big box" retail ASM context, that the burden is "not non-existent"); *Jenkins*, 853 F. Supp. 2d at 322 (same).

Therefore, "a court must nonetheless take a measured approach when addressing a request for collective action certification, mindful of the potential burden associated with defending against an FLSA claim involving a broadly defined collective group of plaintiffs." *Ikikhueme v. CulinArt, Inc.*, No. 1:13-cv- 00293 (JMF), 2013 U.S. Dist. LEXIS 77720 at **4-5 (S.D.N.Y. June 3, 2013). [18]

---

[18] Similarly, considerations of time, cost, and efficient use of judicial resources weigh against "rubber-stamping" a plaintiff's proposed collective-action class when that plaintiff has not presented sufficient evidence to justify the particular class he or she is seeking. Unwarranted conditional certification of a broad and ill-defined collective-action class unnecessarily requires parties to engage in expensive discovery and briefing, resulting in extensive legal fees, only to have the class decertified at a later stage in these proceedings.  *See Guillen II* 841 F. Supp. 2d at 803 ("*Guillen II*") (rejecting argument that "any (cont'd)

Specifically, because the burden for establishing the appropriateness of conditional certification is relatively low when compared to the reward to plaintiffs – court-facilitated notice to all potential litigants nationwide on the employer's dime – courts recognize inherent risks in sponsoring "fishing expeditions." *See, e.g., Burkhart-Deal v. Citifinancial, Inc.*, No. 07-1747, 2010 U.S. Dist. LEXIS 9534, at **17-18 (W.D. Pa. Feb. 4, 2010) ("court-facilitated notice to a nationwide opt-in class would constitute little more than solicitation on behalf of Plaintiff's cause"); *see also Dejesus v. HF Mgmt. Servs., Inc.*, No. 12-4565, slip op. at 2-3 (2nd Cir. Aug. 5, 2013) (recognizing "the possible use by lawyers representing plaintiffs in [FLSA] cases of standardized, bare-bones complaints … to engage in 'fishing expeditions'"). Such risks are particularly acute here, where the court is asked to certify a large class based on inferences of similarity which, in turn, are based on a modicum of conclusory and/or conjectural evidence, and contradicted by the full record.[19]

## B.    The Legal Context Within Which Plaintiffs' Claim Must Be Adjudicated

Plaintiffs challenge their exempt status under the FLSA, *see* 29 U.S.C. § 213(a)(1), and accordingly, their claims will be evaluated based upon whether the record shows, by a preponderance of the evidence, that they were employed in a bona fide executive or administrative capacity – or a combination of both exemptions.   *Id.*   In the context of a retail assistant manager case, accordingly, the

---

overinclusiveness in the scope of the collective action should be corrected during the second stage of review following conditional certification") (citations and internal alterations omitted).

[19] The court permitted pre-conditional certification discovery, including the depositions of the then-named and opt-in plaintiffs and Kohl's corporate representatives, as well as the production of documents.  Therefore, in addition to the declarations submitted by the parties, the Court now has this deposition testimony and should consider all the evidence before it, including additional, relevant evidence brought to bear by Kohl's.  *See Neary v. Metro. Prop. & Cas. Ins. Co.*, 517 F. Supp. 2d 606, 619 (D. Conn. 2007) (when considering conditional certification, the court "will rely on the testimony, affidavits, and documentary evidence submitted by both parties"); *see also Cuzco v. Orion Builders, Inc.*, 477 F. Supp. 2d 628, 632 n.3 (S.D.N.Y. 2007) (same).  Moreover, federal courts, including those within the Second Circuit, have made evidence offered by the defendant a central piece of their decision that plaintiffs relying on unsupported claims in search of conditional certification failed to meet their burden.  *See Ahmed v. T.J. Maxx Corp.*, 10-cv-3609, 2013 U.S. Dist. LEXIS 81942 at *35, 41-42. (E.D.N.Y. June 8, 2013) (denying conditional certification in retail ASM case and relying, in part, on defendant's declaration evidence from plaintiffs' peers because evidence adverse to the plaintiffs' claim, coupled with the plaintiff's inability to identify any evidence that could plausibly link his experience to thousands of putative class members proved fatal to his motion); *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 356 (E.D.N.Y. 2008) (denying conditional certification where defendant's affidavit from one manager refuted plaintiff's contention).

record must be developed to determine whether Plaintiffs' (or potentially other ASMs') primary duty consisted of the management of a recognized retail department or subdivision; whether they customarily directed the work of two or more employees; whether they had authority to make recommendations regarding employees' change in status; or alternatively, whether their primary duty included non-manual work related to the management of Kohl's business, including the exercise of discretion and independent judgment. *See* 29 C.F.R. § 541.100(a) (describing the requirements of the executive exemption); 29 C.F.R. § 541.200(a) (administrative exemption).

Kohl's is not asking the Court to apply these standards to the evidence developed to date, but this is the overarching legal lens through which the request for judicial intervention must be examined. *See Guillen II*, 841 F.Supp.2d at 800 (conditional certification inappropriate where plaintiffs offered "virtually no evidence suggesting that Guillen is similarly situated to ASMs in Marshalls[20] stores nationwide with respect to the main contention in the case: that he was required to perform tasks that rendered him non-exempt from the FLSA's overtime requirements."); *see also Bramble v. Wal-Mart Stores, Inc.,* 09-cv-4932, 2011 U.S. Dist. LEXIS 39457, at **18-19 (E.D. Pa. Apr. 12, 2011) ("For the purposes of plaintiffs' FLSA misclassification claim, 'similarly situated' must be 'analyzed in terms of the nature of the job duties performed by each class member, as the ultimate issue to be determined is whether each employee was properly classified as exempt.'") (citation omitted).

To obtain certification of their claim, Costello and Reed must show they can prove these elements representationally, based on their personal experience, in a manner that would permit the Court (and a jury) to logically infer that approximately 3,500 Kohl's ASMs are misclassified. Again, this question does not require an examination of "the merits," as Costello and Reed are certain to argue.

---

[20] Like Kohl's, the Marshall's, TJMaxx and HomeGoods stores at issue in the *Guillen*, *Ahmed* and *Jenkins* cases, were physically large, nationwide "big box" retail stores selling, among other things, apparel, accessories, footwear and home merchandise.

Rather, at this stage, the Court must determine, based on the evidence now available, whether Costello and Reed and the purported FLSA collective are at least plausibly "similarly situated" with respect to the claim that all Kohl's ASMs share a common primary duty of performing *non-exempt* tasks.

**C.      Recent Retail ASM Cases Squarely Reject Plaintiffs' Argument They Are Similarly Situated Based On Lawful Common Policies and Job Descriptions**

Cutting through the clutter and rhetoric of Plaintiffs' Motion, their entire argument ultimately consists of a single sentence of argument and nearly two pages of string cites to cases in which courts have conditionally certified classes sought by *other plaintiffs* involving *other defendants* on *other facts* that have no bearing whatsoever on the critical question the court must answer at this stage – whether *these plaintiffs* and potential opt-in plaintiffs 'together were the victims of a common policy or plan that violated the law'" perpetrated by *this defendant* based on *these facts*. *See* Dkt. 43 at 20-22*; Myers*, 624 F.3d at 555.    Plaintiffs conclusorily argue that "ASMs at Kohl's are governed by the same set of designated job duties and responsibilities, are compensated in the same manner, are classified as exempt from the FLSA's overtime provisions, and are subject to the same job description, corporate policies, and work rules" and thus "Kohl's has a "uniform business practice' of treating ASMs similarly throughout the United States." *Id.* at 23.  This argument has, however, been rejected by this court, other Second Circuit courts, and other federal courts.  It should again be rejected here.

The so-called "evidence" that Costello and Reed have put forward to support their request for nationwide notice to some 3,500 individuals fits into four discrete categories: (1)  Kohl's classified all of its CFH ASMs and AA ASMs as exempt; (2) Kohl's maintains a single job description and pay structure for the CFH ASM and AA ASM positions; (3) Kohl's maintains corporate policies and training materials that apply to each CFH ASM and AA ASM; and (4) all ASMs nationwide perform

the job the same way.[21]  *Id.* at 22-23.   Costello and Reed claim that, taken together, these facts demonstrate that "Kohl's has an admitted uniform and common policy not to pay overtime to ASMs" that warrants certification.  *Id.* at p. 23.

Costello and Reed, however, "miss[] the point".  *Harriel,* 2012 U.S. Dist. LEXIS 97527, at *16-17.  It is well-settled that the "factual nexus" they must construct cannot, as a matter of law, be established by Kohl's uniform classification of ASMs as exempt executives.  *Jenkins,* 853 F.Supp.2d at 323; *Guillen II,* 841 F. Supp. 2d at 802; *Bramble,* 2011 U.S. Dist. LEXIS 39457, *15 (")[T]he mere classification of a group of employees – even a large or nationwide group – as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all class members as similarly situated.") (internal quotes and citation omitted).  Nor are the other components of Costello's and Reed's showing – that ASMs share the same job description and pay structure, are subject to the same policies, and allegedly receive the same training – legally sufficient to establish that ASMs are similarly situated, even under "lenient" scrutiny.  *See Guillen v. Marshalls MA, Inc. (Guillen I)*, 750 F. Supp. 2d 469, 477-48 (S.D.N.Y. 2010) (the existence of standardized operational procedures, management program, policies, and an identical hierarchal management structure "does little to add to the inference that ASMs nationwide were similarly situated to Guillen with respect to his claim that he was required to spend a majority of his time performing non-exempt tasks."); *Guillen II*, 841 F. Supp. 2d at 802 (same); *Harriel,* 2012 U.S. Dist. LEXIS 97527, at *17 ("The existence of a job description containing many material tasks applicable to a certain position, paired with a superficial allegation that plaintiff was improperly classified as exempt under the

---

[21] To buttress these arguments, Plaintiffs devote substantial space to reciting FRCP 30(b)(6) deposition testimony .  in support.  Dkt. No. 43 at 4-8.  However, the mere existence of uniform policies and procedures, and job descriptions, is insufficient to satisfy a plaintiff's burden on conditional certification.  If the existence of such policies and job descriptions were sufficient, virtually every business in corporate America would automatically be subject to certification.  That is not what the law requires to justify the judicial intervention Costello and Reed seek.

FLSA, misses the point of a putative FLSA collective action such as the one pursued here, insofar as the action turns on the alleged discrepancy between the job on paper and the job in practice but the evidence fails to show how the plaintiff and others were similarly subjected to an improper compensation practice by defendant."); *see also Bramble*, 2011 U.S. Dist. LEXIS 39457, at *15; *Babin v. Stantec, Inc.*, 2010 U.S. Dist. LEXIS 88009, at *11-12 (E.D. Pa. Aug. 25, 2010). Plaintiffs' claim that a single job description, or, for example, the availability of the same management training, renders them similarly situated is insufficient where, as here, some testified they failed to perform the duties set forth in the job description while still others admit they did perform some of those duties, and received or elected different training.[22]

Indeed, such arguments failed in this court (and other Second Circuit district courts) in the "big box" retail ASM context in *Jenkins*, *Guillen I*, *Guillen II*, *Guillen III*, *and Ahmed* – and they must also fail here. In *Jenkins*, the plaintiff argued that nationwide notice was appropriate to ASMs employed at HomeGoods stores across the country "because all ASMs were subject to uniform formal policies[,]" including a formal policy describing ASM job duties, one set of management training materials, and a single job description. 853 F.Supp.2d at 321-322. "Notably," the Court observed, "the Plaintiff does not allege that HomeGoods' official, formal policy mandates non-exempt job duties and thus violates the FLSA in and of itself. Rather, the Plaintiff alleges that, in practice, he primarily performed non-exempt duties, such as cleaning, sweeping, bagging products, hanging store signs, taking out the garbage, and unloading the delivery trucks." *Id.* (underline added). In other words, Jenkins actually based his request for notice upon the alleged existence of a "common de facto policy requiring ASMs

---

[22] Costello's and Reed's admissions that they understood that the ASM job description set forth Kohl's expectations of how they should perform the job, but failed to meet those expectations, is significant because an employee cannot convert an exempt position to a non-exempt position simply by failing to perform expected exempt duties. *See DiBlasi v. Liberty Mut. Ins. Group Inc.*, Case No. 1:12-cv-10967-RGS, 2014 U.S. Dist. LEXIS 45898 at *29-*33 (D. Mass. Apr. 3, 2014). Thus, the notion that Kohl's maintained an illegal common policy of not paying ASMs overtime is a red herring. Costello and Reed may well believe they should have been paid overtime because they failed to perform exempt tasks, but their failure to do so does not make their job non-exempt any more than it renders Kohl's failure to pay them overtime illegal.

to perform non-exempt tasks[,]" but only offered his own testimony in support of the claim that this "de facto policy" was an experience common in every HomeGoods store nationwide. *Id.* (underline added). This Court declined to make such a broad and unsupported inference. *Id.*

This court also squarely recognized this fundamental disconnect in *Guillen*, denying conditional certification to a plaintiff claiming he was "similarly situated" pursuant to the same corporate policies and training procedures as ASMs employed at the Marshalls' retail stores:

> Guillen's conclusory statement that 'Marshalls employed a high degree of standardized operational practices at [his] store including the use of a standardized management training program, standardized employment policies and . . . an identical hierarchical management structure,' . . . does little to add to the inference that ASMs nationwide were similarly situated to Guillen with respect to his claim that he was required to spend a majority of his time performing non-exempt tasks. There is no information provided as to the nature of these 'standardized operational practices' and how they relate to the claim that Marshalls' ASMs are required to perform non-exempt tasks for a majority of their workweek in contravention of the ASM job description. . . . . Essentially, plaintiff's argument on this point boils down to the proposition that where there is a corporate management structure that applies to all regions of the country – as is likely true for many, if not most, companies that operate nationally – any single employee may plausibly assert that employees throughout the country are similarly situated with respect to that employee's day-to-day job activities even if those job activities contravene the company's stated requirements.

*Guillen I*, 750 F.Supp.2d at 477-78; *see also Guillen II,* 841 F.Supp.2d at 800; *Ahmed*, 2013 U.S. Dist. LEXIS 81942, at *37 (where employer's official policy is lawful, plaintiff must produce "significant evidence of a de-facto illegal policy" to secure conditional certification); *quoting Vasquez v. Vitamin Shoppe Indus. Inc.*, 2011 U.S. Dist. LEXIS 74376, *3 (S.D.N.Y. July 11, 2011) (denying certification despite claim that plaintiff "spent 80% of his time as an SM performing non-managerial tasks" and that "his duties did not include managerial responsibilities or the exercise of independent business judgment."). The Chief Judge of the Southern District of New York agreed with the denial of conditional certification in *Guillen*  -- a case nearly identical to this one (and suffering from the same

failures of evidence and involving the same plaintiffs' counsel), noting that where, as here, plaintiffs rely on no more than bare, self-serving allegations and the notion that plaintiffs and the class they sought to represent were similarly situated because Marshalls admittedly failed to pay all ASMs nationwide overtime, "[t]his Court will not presume without more, however, that such a national host of "collective action members" with "allegations that the law has been violated" in fact exists." *Guillen III*, 2012 U.S. Dist. LEXIS 91639, at \*4 (Preska, C.J.).

Of course, Costello and Reed ignore these precedents.  Instead, they principally rely upon conditional certification decisions from this district in the retail pharmacy context (Dkt. 43 at 22-23) – a setting involving stores remarkably smaller in physical size and management team that bear no resemblance to the "big box" retail world in which Kohl's resides, where each ASM is responsible for managing all facets of a multi-million business, and planning and directing the work of about 20 to 60 reports to drive sales.  This is not a pharmacy case – it is instead precisely like the *Guillen*, *Jenkins* and *Ahmed* cases involving similar "big box" retailers where this court denied conditional certification sought on the basis of the same thin and unsupported "evidence."  Indeed, the only decision of this court upon which Costello and Reed rely involving a "big box" retailer was expressly distinguished from *Jenkins* and *Guillen* because, unlike here, "the job descriptions for Assistant Managers demand[ed] the performance of nonexempt duties".  *See Ferreira v. Modell's Sporting Goods, Inc.,* Civ. No. 11-2395 (DAB), 2012 U.S. Dist. LEXIS 100820, at \*8-9 (S.D.N.Y. July 16, 2012).

Moreover, faced with a facially lawful job description, diverse training emphasizing managerial tasks, and legal corporate policies, Costello and Reed turn to the ***only*** factual showing they have conceivably made: that a mere seven of approximately 3,500 putative FLSA collective members (approximately ***0.2% of the ASMs employed with Kohl's during the alleged limitations period, who worked in just 10 of 1,160 (0.8%) of Kohl's store nationwide***) claim to have generally performed their

jobs in a manner that directly contravenes the job description, management training and corporate policies, and, in some instances, the admittedly truthful statements on their own resumes.[23]  Plaintiffs ignore that their testimony makes clear *they are not even "similarly situated"* **to one another** because it shows that each performed their jobs differently. *See* Section C.1.2, *supra*. The testimony of the very ASM peers they seek to represent also shows that Plaintiffs did not have the same job duties and responsibilities as those peers. Taken together, the full record demonstrates that individual Kohl's ASMs perform their jobs differently based on myriad factors.  *See* Section C.1.3, *supra*.  How else can one explain that ASM Melissa Harris performed a wide range of exempt, management duties about 70% of the time as a CFH ASM while, at the same time, in the very same store, Loniece Reed claims to have zero management responsibility as the AA ASM?  *Id.*  Harris and Reed are anything but similarly situated, and Plaintiffs and the collective they seek to represent are similarly *dissimilar*.

In the end, Costello's and Reed's evidentiary proffer is insufficient to, as the Second Circuit required in *Myers*, make even "a 'modest factual showing' that they and potential opt-in plaintiffs 'together were the victims of a common policy or plan *that violated the law.*'" 624 F.3d at 555 (emphasis added).  No reasonable inference that they are similarly situated to themselves or other ASMs can be drawn where some plaintiffs admittedly represented to others, including prospective employers, that they performed the same management duties they *now* deny having performed.  The contradictions between Plaintiffs' claims and their testimony leaves them with no more than an incoherent hodge-podge of inconsistent statements that cannot possibly serve as *representative proof* for themselves, let alone others.  Their motion should be denied.

---

[23] *See Ahmed*, 2013 U.S. Dist. LEXIS 81942, at *40-42 ("The Court simply cannot presume the existence of a de facto illegal policy common to all Assistant Store Managers in more than 4,000 stores across the entire nation based only on allegation from three . . . working in merely a handful of stores . . . ."); *Guillen I*, 750 F.Supp.2d at 477, 479 (testimony from five managers who worked at 9 of the defendant's 820 stores nationwide provided "virtually no basis on which to conclude that ASMs nationwide are similarly situated to Guillen with respect to allegation that he spent most of his time performing non-managerial tasks.").

### D.   Costello's and Reed's claim is too individualized for representative proof

It necessarily follows that Plaintiffs' testimony that they defied Kohl's ASM expectations and performed primarily (or only) non-exempt tasks further demonstrates that these claims are too individualized for representational proof.  Courts in this Circuit (and others) have determined, under analogous circumstances and weighing an employer's countervailing evidence, that misclassification claims premised on evidence like Costello's and Reed's are unfit for collective action treatment.[24]  As this court noted in *Vasquez*, because FLSA regulations explicitly permit concurrent performance of exempt and non-exempt tasks, an assessment of whether a manager was properly classified would need to be made on a case-by-case basis involving a fact-intensive inquiry regarding the manager's primary duty.  *Vasquez*, 2011 U.S. Dist. LEXIS 74376 at *11; *see also Vargas*, 2012 U.S. Dist. LEXIS 113993 at *13-14 (certification denied based on differences in declarations of co-workers indicating that class members had differing understandings of their job duties and spent time doing different things).

Here, the court need look no farther than *Plaintiffs' own testimony*, and that of their ASM peers, for proof that responsibilities of individual Kohl's ASMs varied and that they performed their jobs in dramatically different ways.  *See* Section C.3, *supra*.  Finally, the record is clear that many factors make an individual's performance of the ASM job unique including: (1) a store's volume, location, layout, and climate; (2) the number and experience of Store Executives; (3) the staffing of supervisory and overnight positions in a given store; (4) the experience of an ASM's direct reports; and (5) the management style of the Store Manager.

---

[24] *See Guillen I*, 750 F.Supp.2d at 477, 479; *Vargas v. HSBC Bank USA, N.A.*, 2012 U.S. Dist. LEXIS 113993, *13 (S.D.N.Y. Aug. 9, 2012); *Bramble*, 2011 U.S. Dist. LEXIS 39457, at *23-28 (collecting cases); *Diaz*, 2005 U.S. Dist. LEXIS 30382 at *13-14 (W.D.N.Y. Oct. 13, 2005) (denying conditional certification of a nationwide class of store managers where "[t]he responsibilities of SMs vary in number and types of employees supervised and in types of stores managed – in terms of physical space, sales volume and geographic location" because "[a]  although SMs share the same job description, their responsibilities, in fact, may differ and thus a highly fact-specific and detailed analysis of each SM's duties is required, making class treatment inappropriate.").

Kohl's potential defenses are individualized as well.  As detailed above, ASMs have many job responsibilities, some of which fall within the executive exemption and others within the administrative exemption and the combination exemption.  Which exemption or combinations of exemptions apply will differ by ASM.  To the extent a particular ASM claims that he or she does not predominantly perform exempt duties, Kohl's can then show that the ASM is not fulfilling job expectations, which can be demonstrated through direct questioning and reference to the particular ASM's personnel documents, such as job evaluations and counseling.  For example, counseling and/or discipline of an ASM (like Costello, for example) may show that an ASM who performs primarily nonexempt tasks is not meeting the expectations of the job.  *See Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785, 802 (1999) (an employee who is supposed to be engaged in exempt work cannot avoid the exemption due to his or her own substandard performance); *see, e.g.*, Ex. K, Black Decl. (Costello Counseling Form).  Alternatively, a job evaluation or resume might reference exempt duties being performed by the particular ASM in contradiction to the ASM's testimony.

The Court need not assess the credibility of this testimony now (as Costello and Reed are sure to suggest Kohl's is urging the Court to do), or weigh it against the merits of Costello's and Reid's claims and Kohl's defenses.  Rather, the existence of their own divergent testimony simply illustrates why, at even the most basic level (*e.g.*, focused on who is telling the truth), Costello's and Reed's misclassification claim is incompatible with the economies of scale the FLSA is designed to achieve: proof of the claims of many through the representative testimony of few.  Conditional certification is a case management tool that should only be employed in appropriate cases.  It is not appropriate here.

## **CONCLUSION**

For the reasons set forth above, Defendants respectfully request that this Court deny Plaintiffs' motion for conditional certification in its entirety.

Dated:   May 30, 2014                    Respectfully submitted,

                                         */s/ Richard W. Black*
                                         _____
                                         Jaime L. Novikoff
                                         Lisa A. Schreter, admitted *pro hac vice*
                                         Richard W. Black, admitted *pro hac vice*
                                         LITTLER MENDELSON, P.C.

                                         *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 30th day of May, 2014, a copy of the foregoing Defendants' Opposition to Plaintiffs' Motion for Conditional Certification has been served with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

> Marc S. Hepworth
> Charles Gershbaum
> David A. Roth
> Matthew A. Parker
> HEPWORTH, GERSHBAUM & ROTH, PLLC
> 192 Lexington Avenue, Suite 802
> New York, New York 10016
> Droth@hgrlawyers.com
> Charles@hgrlawyers.com
> Mhepworth@hgrlawyers.com
> Mparker@hgrlawyers.com


> /s/ Richard W. Black
> Richard W. Black

Firmwide:127162499.6 071499.1002
5/29/14